ROBERT R. ANDERSON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Anderson v. Commissioner
Docket No. 3004-90
United States Tax Court
T.C. Memo 1995-8; 1995 Tax Ct. Memo LEXIS 8; 69 T.C.M. (CCH) 1609; T.C.M. (RIA) 95008; January 11, 1995, Filed *8 Decision will be entered under Rule 155. P was the majority shareholder, president, and treasurer of Anderco, Inc. (A). P deposited large sums of money, which had been diverted from A, into various savings accounts held in P's name between 1976 and 1979. P withdrew most of the deposits in 1979, and, in 1981, deposited much of the withdrawn sums into certificates of deposit, some of which were held in the name of P or A. The notice of deficiency was sent to P more than 3 years after he filed his tax returns; however, the parties stipulated that, because of extensions, the limitations period had not expired for 1977, 1980, and 1981. 1. Held: The statute of limitations does not bar the assessment and collection of tax for 1976, 1978, or 1979. Sec. 6501(c)(1), I.R.C. 1954. 2. Held, further, P is liable for additions to tax for civil fraud for 1976, 1977, 1978, and 1979. Sec. 6653(b), I.R.C. 1954. 3. Held, further, P's 1976 tax return was filed late and P's timely filed requests for extensions for his 1977, 1978, and 1979 tax returns were invalid. As a result, the base for imposition of the civil fraud addition to tax for each of these years is the *9 entire tax liability for the year, unreduced by the tax liability shown on that year's tax return. Secs. 6653(c)(1), 6081, I.R.C. 1954. 4. Held, further, deductions and credits for alleged repayments in 1981 disallowed. Secs. 165(c)(2), 1341, I.R.C. 1954. 5. Held, further, amounts of deficiencies determined for 1976 through 1981. For petitioner: Alan T. Durst. *
For respondent: Jennifer H. Decker. CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6653(a)[1] (negligence, etc.) and 6653(b) (fraud) against petitioner as follows: Additions to Tax Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6653(b)
1976 [1]
$  37,969.43
--  --  --
$ 19,297.72
1977
160,222.19
--  --  --
80,111.10
1978
42,990.65
--  --  --
21,495.33
1979
52,798.17
--  --  --
26,399.09
1980
7,173.63
$ 358.68
--  --
--  1981
2,868.63
--  $ 143.43 [2]
[1]
--  *10 By amendment to answer, respondent asserts increased additions to tax under section 6653(b) in amounts such that the total additions to tax for 1976 through 1979 are as follows: Total Sec. 6653(b)
Year
Additions to Tax
1976
$ 24,573.87
1977
86,038.10
1978
32,245.33
1979
44,024.09
This amendment to answer does not affect the amount of the deficiency determined for any year. After concessions by both sides and a deemed concession by petitioner, [2] the issues for decision are as follows: (1) Whether the assessment and collection of deficiencies and additions to tax for 1976, 1978, and 1979 are barred by the statute of limitations, sec. 6501(a), or are allowed under the fraud exception, sec. 6501(c)(1), to the general period of limitations. *11 (2) If assessment and collection are not barred for 1976, 1978, and 1979, then, for each of those years and for 1977 -- (a) whether petitioner is liable for civil fraud additions to tax under section 6653(b). (b) what is the amount of petitioner's unreported taxable income. (c) what is the amount of petitioner's underpayment, within the meaning of section 6653(c).
(3) To what deductions or credits is petitioner entitled for 1980 and 1981.
FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioner [3] resided in Independence, Ohio. *12 Petitioner's Background
Petitioner served in the Navy during World War II. After being discharged from active duty about June 1946, petitioner resumed his formal education by attending the University of Colorado. Petitioner was graduated from the University of Colorado in 1949 with a bachelor of science degree in civil engineering. After graduation, petitioner went to work for the Special Investigations Branch of the United States Bureau of Reclamation. Petitioner left that job after 8 or 9 months. He then went to work for PrePak Corp. doing laboratory testing and research on concrete engineering. He left Prepak Corp. in 1956. From 1956 through March 1972, petitioner was employed by the Lee Turzillo Contracting Co. (hereinafter sometimes referred to as Turzillo), a general contractor for heavy construction throughout the United States and in Canada. Petitioner's roles at Turzillo included salesman, sales manager, and executive vice president. As executive vice president, petitioner was second-in-command of Turzillo, and participated in management meetings with other Turzillo officers. Various types of corporate financial statements were reviewed and discussed at these *13 management meetings. Some of the financial statements that petitioner reviewed while at Turzillo showed corporate savings accounts and certificates of deposit held by Turzillo. Petitioner owned about 6 or 7 percent of Turzillo's stock. Petitioner's Business
In 1972, petitioner left Turzillo and began doing business as a sole proprietorship called The Anderson Company (hereinafter sometimes referred to as the Company), which operated a construction business similar to Turzillo. The Company specialized in structural concrete repairs, augered piles, underwater investigations, and cement base and chemical grouting. On October 8, 1975, petitioner incorporated the Company's business under the name Anderco, Inc. (hereinafter sometimes referred to as Anderco). During each of the years in issue, petitioner owned 94 percent of Anderco's stock and Ella owned the remaining 6 percent. For the years before Anderco was incorporated, petitioner reported the Company's income and expenses on Schedules C, and identified the business as "The Anderson Company". Although the Company's business was transferred to Anderco, some of the Company's equipment remained titled in petitioner's name. *14 Petitioner reported Schedule C income from the Company, purportedly from equipment rentals, for each of the years 1976 through 1980. Petitioner was the president and treasurer of Anderco during the years in issue. From May 1976 onward, he was the person who routinely opened mail received by Anderco and deposited Anderco's gross receipts. Petitioner exercised complete control over the management and day-to-day operations of Anderco. The Company initially was operated out of petitioner's home, in Independence. Then, the Company's office was moved to Brooklyn, Ohio. Then, the Company's office was moved to Parma, Ohio, its location when Anderco was incorporated. Anderco's office remained in Parma through the years in issue. Petitioner's home address continued to be used as the Company's mailing address and, at times, as Anderco's mailing address. Petitioner hired Paul J. Roberto (hereinafter sometimes referred to as Roberto), a public accountant. Roberto was Anderco's outside accountant, and prepared tax returns for Anderco, and for petitioner and Ella, from 1975 through 1983. Before 1975, Roberto was the Company's outside accountant, and prepared tax returns for the Company's *15 construction business. Roberto prepared petitioner's and Ella's joint tax returns on the basis of Anderco's records and Forms 1099 submitted to Roberto by petitioner and Ella. For the years 1976 through 1981, petitioner was a cash method taxpayer. Anderco did not keep a cash disbursements journal. Anderco's checking account was the only record kept of Anderco's cash disbursements. Anderco's internal accountant coded each Anderco check stub as to job and type of expenditure. Anderco did not show any cash receipts journal to Roberto. Roberto recorded Anderco's gross receipts, expenditures, and expenses on the basis of Anderco's cancelled checks, bank statements, check stubs, and deposit slips. Roberto's only source of information as to Anderco's receipts was from Anderco's deposit slips. Roberto explained this system to petitioner. Laura Sledz (hereinafter sometimes referred to as Sledz) worked for petitioner from 1974 to 1983. She was petitioner's secretary and also was purchasing agent and office manager. Sledz recorded receipts for each job on a sheet maintained in the file for that job. At some point, Sledz began to record the receipts in a ledger. She kept the ledger *16 in her unlocked desk. Thereafter, she sometimes also recorded the receipts on the job file sheet, and sometimes she did not. Petitioner was aware of Sledz's ledger. Petitioner told Sledz that the ledger should be kept someplace safer than her desk. In September 1979, Sledz discovered that the ledger was no longer in the office. Diverted Anderco Receipts
Petitioner diverted Anderco receipts, most of which initially were deposited into savings accounts opened in petitioner's name. The items described in table 1 were deposited into savings accounts [4] *17 opened in petitioner's name during 1976 through 1979. [5]
*18 These items were not reported as income on petitioner's 1976 through 1979 tax returns. The interest on these savings accounts was reported as petitioner's interest income on petitioner's tax returns; the interest was not reported as Anderco's interest income on Anderco's tax returns. Table 1
Savings Account and Year
of Receipt
Amount
1976
Euclid-2
$ 40,000.00
Euclid-2
4,887.50
Euclid-3
6,000.00
Euclid-3
10,000.00
Total 1976
[1] 60,887.50
1977
Euclid-3
44,000.00
United-1
24,268.00
Union-2
51,897.00
Union-2
57,374.80
Union-2
1,140.00
United-1
9,853.00
United-1
7,130.00
Union-2
15,018.26
Union-2
13,678.26
Orleans-2
24,838.09
Total 1977
249,197.41
1978
United-1
800.00
Orleans-2
26,733.46
Orleans-2
33,482.90
Orleans-2
400.00
Orleans-2
510.00
Total 1978
[2] 61,926.36
1979
Orleans-1
6,196.40
Orleans-1
30,080.00
Orleans-1
28,000.00
Firestone-1
19,754.38
Total 1979
84,030.78
*19 In addition to the deposits listed in table 1, two checks listed in the notice of deficiency were not reported as income on petitioner's tax returns. These checks cannot be traced (on the record in the instant case) as having been deposited into any of petitioner's accounts. The first, a check from Black, Inc., to the Company in the amount of $ 8,318, was endorsed "for deposit only the Anderson Co." by Ella in February 1976. The second, a check dated September 27, 1978, from Dayton Power to Anderco in the amount of $ 6,362.53, was endorsed "Anderco, Inc." by petitioner on June 4, 1979, at the Orleans Federal Savings & Loan of Parma. "FOR DEPOSIT ONLY" is stamped immediately below the endorsement. It is not clear whether the Dayton Power check was used on June 4, 1979, to buy an official check from Orleans Federal Savings & Loan of Parma, in the amount of $ 7,189.28. That $ 7,189.28 check is further described infra under Broadview-3. All the deposits listed in table 1, and the checks from Black, Inc., and Dayton Power, were gross receipts to Anderco and were constructively received by Anderco in the years shown in table 1. See supra note 5. During each of the *20 years in issue, Anderco's earnings and profits were sufficient to permit the full amounts of the receipts that respondent alleges petitioner diverted from Anderco to be taxed as constructive dividend income to petitioner. In April 1979, while reviewing the preparation of petitioner's and Ella's 1978 tax return, Roberto noted that petitioner's and Ella's 1978 interest income had increased by more than $ 9,000 over their reported 1977 interest income. See infra table 10. Roberto calculated that the increase in interest income implied an increase in average savings account balances that was larger than could be expected from the income that had been reported on petitioner's and Ella's tax returns. Roberto was so concerned about this matter that he telephoned petitioner on a Sunday morning to get an explanation. Petitioner explained that he was depositing some of Anderco's receipts into his own savings accounts. Roberto pointed out that the diverted Anderco receipts had not been reported as income. Roberto advised petitioner to transfer the diverted Anderco receipts to Anderco's bank account at once so that the receipts could be picked up as Anderco's gross receipts. In June *21 1979, petitioner withdrew most of the balances in Orleans-1, Orleans-2, Union-1, Union-2, and United-1 in the form of official checks made out in his name, and held the checks until 1981. Petitioner first learned that his tax liabilities were being investigated when two special agents of the Internal Revenue Service came to his office on September 10, 1979. The special agents told petitioner that they were examining his 1976, 1977, and 1978 tax returns, and explained to him the role of special agents. Euclid-1 and 1A
Petitioner opened Euclid-1 on May 21, 1973, as a commercial checking account in the Company's name. Petitioner was the sole owner of Euclid-1. Euclid-1 required only one signature. Petitioner was an authorized signatory on Euclid-1. Until September 16, 1976, petitioner and Ella were the only authorized signatories on Euclid-1; after September 16, 1976, petitioner was the only authorized signatory. Petitioner's residence in Independence was Euclid-1's mailing address. Euclid-1 was used by the Company, and later by Anderco, as its business checking account. On July 21, 1978, Anderco opened a new commercial checking account, Euclid-1A, to serve as its business *22 checking account. Petitioner was the only authorized signatory on Euclid-1A. Petitioner's residence in Independence was Euclid-1A's mailing address. About mid-October 1978 Anderco's receipts began to be deposited into Euclid-1A. Euclid-2
Petitioner opened Euclid-2 on May 24, 1976, as a savings account in his name. Petitioner was the only authorized signatory on Euclid-2. Petitioner's Social Security number appears on the Euclid-2 signature card. Anderco's address in Parma was Euclid-2's mailing address. Euclid-2 was opened about a week after a violent confrontation between petitioner and Ella. The initial deposit to Euclid-2 was in the amount of $ 6,000. The record does not indicate the source of this deposit. On June 14, 1976, petitioner endorsed a $ 130,238.91 check that had been made out to the Company, and deposited $ 40,000 of this check into Euclid-2 and the remaining $ 90,238.91 into Euclid-1. The $ 40,000 deposited into Euclid-2 constitutes gross receipts to Anderco, and was constructively received by Anderco in 1976. On July 1, 1976, petitioner deposited into Euclid-2 a $ 4,887.50 check that had been made out to the Company; this constitutes gross receipts *23 to Anderco, and was constructively received by Anderco in 1976. On July 24, 1976, petitioner deposited into Euclid-2 a $ 5,305.55 New York State income tax refund check. [6] The New York State income tax refund check was a personal receipt of petitioner and Ella, and was not Anderco's property. Two other deposits were made into Euclid-2 -- $ 117.21 on June 30, 1976, and $ 236.46 on August 3, 1976. The record does not indicate the sources of these two deposits. *24 On August 3, 1976, petitioner withdrew the entire $ 56,546.72 [7] balance from Euclid-2 in the form of an official check, and closed the account. The record does not indicate what happened to this official check. Euclid-2 was petitioner's savings account. Euclid-3
Petitioner opened Euclid-3 on October 23, 1976, as a savings account in his name. Petitioner was the only authorized signatory on Euclid-3. Petitioner's Social Security number appears on the Euclid-3 signature card. Petitioner's residence in Independence was Euclid-3's mailing address. Table 2 shows all of the deposits into and withdrawals from Euclid-3 through March 31, 1981. Table 2 Date
Action
Deposit
Withdrawal
10/23/76
Trotti & Thompson
[1] $ 6,000.00
to the Company
10/23/76
AT&T dividend
64.60
to petitioner
11/30/76
Simplicity Pattern Co.,
[1] 10,000.00
Inc., to the Company
3/04/77
Unknown
1,211.37
4/09/77
Fred Meir Construction
[1] 44,000.00
Co. to the Company
4/27/77
Withdrawal to pay
4,554.71
legal fee [2]
5/04/77
Withdrawal
13,500.00
7/01/77
Unknown
13,500.00
8/31/77
Transfer to Union-1
56,000.00
*25 The Trotti & Thompson check to the Company was in the amount of $ 37,447.57. Of this amount, $ 31,447.57 was deposited into Euclid-1 and the remaining $ 6,000 into Euclid-3. The Simplicity Pattern Co., Inc., check to the Company was in the amount of $ 13,217. Of this amount, $ 3,217 was deposited into Euclid-1 and the remaining $ 10,000 into Euclid-3. The record does not indicate what happened to the $ 1,653.96 which remained in Euclid-3 after August 31, 1977, or what happened to the $ 812.22 interest added to Euclid-3 through March 31, 1981. Euclid-3 was petitioner's savings account. United-1
Petitioner opened United-1 on July 2, 1977, as a savings account in his name. Petitioner was the only authorized signatory on United-1. Petitioner's Social Security number appears on the United-1 signature card. Petitioner's residence in Independence was United-1's mailing address. Table 3 shows all of the deposits into and withdrawals from United-1. Table 3
Date
Action
Deposit Withdrawal
7/02/77
Linbeck Construction
[1] $ 24,268
Corp. to the Company
10/14/77
Esch Construction Co.
[1] 9,853
to the Company
10/14/77
Leo W. Schmidt Co.
[1] 7,130
to the Company
3/25/78
United Savings Assn.
[2] 1,800
to the Company
3/25/78
Transfer to Euclid-1
[2] $ 1,000.00
6/30/79
Transfer to
46,377.49
Broadview-4
*26 Petitioner closed United-1 on June 30, 1979, by withdrawing $ 46,377.49 in the form of an official check payable to petitioner. Petitioner held the check until January 13, 1981, when the check was deposited into an account at National City Bank. The funds were used to buy a certificate of deposit in Broadview-4 on January 15, 1981. United-1 was petitioner's savings account. Union-1
Petitioner opened Union-1 on September 1, 1977, as a savings account in his name. Petitioner was the only authorized signatory on Union-1. Petitioner's Social Security number appears on the Union-1 signature card. Petitioner's residence in Independence was Union-1's mailing address. Petitioner opened Union-1 with a deposit of the $ 56,000 check which he had withdrawn from Euclid-3 the day before. On June 13, 1979, petitioner withdrew $ 60,000 from Union-1, in the form of an official check payable to petitioner. The $ 60,000 equals the amount of the deposit from Euclid-3 plus most of the accumulated interest in Union-1. This $ 60,000 check was held by petitioner and used to buy a certificate of deposit in Broadview-3 on January 15, 1981. The record does not indicate what happened to the *27 remaining balance in Union-1, which had grown to $ 1,531.65 by December 31, 1979. Union-1 was petitioner's savings account. Union-2
Petitioner opened Union-2 on September 1, 1977, as a savings account in his name. Petitioner was the only authorized signatory on Union-2. Petitioner's Social Security number appears on the Union-2 signature card. Petitioner's residence in Independence was Union-2's mailing address. Table 4 shows all of the deposits into and withdrawals from Union-2. Table 4
Date
Action
Deposit Withdrawal
9/01/77
Unknown
$ 16,000.00
9/02/77
W.B. Gibson Co.
[1] 51,897.00
to the Company
9/09/77
Withdrawal
16,000.00
9/24/77
W.B. Gibson Co.
[1] 57,374.80
to the Company
[1] 1,140.00
11/01/77
Huntington Alloys,
[1] 15,018.26
Inc., to the Company
11/01/77
Burlington Northern
[1] 13,678.26
to the Company
11/01/77
City of Akron
44,368.92
to the Company
11/17/77
Transfer to Euclid-1
44,368.92
12/31/77
Transfer to Orleans-1
50,000.00
($ 40,000)
and Orleans-2 ($ 10,000)
6/30/79
Transfer to Broadview-3
98,489.05
Petitioner closed Union-2 on June 30, 1979, *28 by withdrawing $ 98,489.05 in the form of an official check payable to petitioner. This $ 98,489.05 check was held by petitioner and used to buy a certificate of deposit in Broadview-3 on January 15, 1981. Union-2 was petitioner's savings account. Orleans-1
Petitioner opened Orleans-1 on February 9, 1978, as a savings account in his name. Petitioner was the only authorized signatory on Orleans-1. Petitioner's Social Security number appears on the Orleans-1 signature card. Anderco's address in Parma was Orleans-1's mailing address. Table 5 shows all of the deposits into and withdrawals from Orleans-1. Table 5
Date
Action
Deposit Withdrawal
2/09/78
Transfer from Union-2
$ 40,000.00
3/09/79
Burlington Northern
[1] 6,196.40
to Anderco
3/09/79
Baker, McHenry & Welch,
[1] 30,080.00
Inc., to Anderco
3/09/79
U. S. Steel Corp.
[2] 28,505.12
to Anderco
3/09/79
J.D. Parish Co., Inc.,
[2] 56,955.51
to Anderco
6/04/79
Transfer to Euclid-1A
[2] $ 57,460.63
6/30/79
Transfer to Broadview-3
109,019.74
*29 Petitioner closed Orleans-1 on June 30, 1979, by withdrawing $ 109,019.74 in the form of two official checks payable to petitioner. These two checks were held by petitioner and used to buy a certificate of deposit in Broadview-3 on January 15, 1981. Orleans-1 was petitioner's savings account. Orleans-2
Petitioner opened Orleans-2 on February 9, 1978, as a savings account in his name. Petitioner was the only authorized signatory on Orleans-2. Petitioner's Social Security number appears on the Orleans-2 signature card. Anderco's address in Parma was Orleans-2's mailing address. Table 6 shows all the deposits into and withdrawals from Orleans-2. Table 6
Date
Action
Deposit Withdrawal
2/09/78
Transfer from Union-2
$ 10,000.00
2/09/78
Zimmer USA to the Company
[1], [2] 24,838.09
8/07/78
General Motors Corp. to
[1] 26,733.46
the Company
8/07/78
National City Bank to
25,142.10
petitioner
8/07/78
Unknown
4,565.50
8/07/78
Transfer to Euclid-1
[3] $ 50,000.00
8/21/78
Transfer to Euclid-1
[3] 30,000.00
10/07/78
National Engineering and
[1], [4] 33,482.90
Contracting Co. to
the Company
10/07/78
Peckham Engineering
[1], [4] 400.00
to the Company
10/07/78
Republic Steel to
[1], [4] 510.00
the Company
4/14/79
Wisconsin Electric
50,482.69
Power Co. to Anderco
5/17/79
Transfer to Euclid-1A
50,482.69
6/30/79
Transfer to Broadview-3
48,355.47
*30 Petitioner closed Orleans-2 on June 30, 1979, by withdrawing $ 48,355.47 in the form of an official check payable to petitioner. This $ 48,355.47 check was held by petitioner and used to buy a certificate of deposit in Broadview-3 on January 15, 1981. Orleans-2 was petitioner's savings account. Firestone-1
Petitioner opened Firestone-1 on May 10, 1980, as a savings account in his name. Petitioner was the only authorized signatory on Firestone-1. Petitioner's Social Security number appears on the Firestone-1 signature card. Petitioner's daughter's address in Suffield, Ohio, was Firestone-1's mailing address. On November 29, 1979, Williams Brothers Construction, Inc., sent its certified check in the amount of $ 22,500 to Anderco's lawyers. On December 10, 1979, Anderco's lawyers sent to petitioner their check in the amount of $ 19,754.38 ($ 22,500 less $ 2,745.62, the remaining legal fee). The $ 19,754.38 net amount is an Anderco 1979 gross receipt item, shown supra table 1. On May 10, 1980, petitioner deposited the $ 19,754.38 check into Firestone-1. See supra note 5. Petitioner withdrew $ 10,000 from Firestone-1 on November 28, 1980, and another $ 9,750.13 *31 on December 12, 1980, both withdrawals being by official checks. The record does not indicate what happened to these withdrawn amounts, or to any remaining balance in Firestone-1. Firestone-1 was petitioner's savings account. Broadview-1
Petitioner opened Broadview-1 on February 23, 1979, in his name. Petitioner was the only authorized signatory on Broadview-1. Petitioner's address in Independence was Broadview-1's mailing address. Broadview-1 consisted of a $ 100,000 certificate of deposit, $ 80,000 of which came from a cashier's check from Euclid National Bank, to petitioner, dated December 29, 1978, in the amount of $ 84,600. This is further discussed infra, "Loan " Repayment in 1978. The account was closed on September 11, 1979, by withdrawal of the $ 100,000. The record does not indicate what happened to the withdrawn amount. Broadview-1 was petitioner's certificate of deposit. Broadview-2
Petitioner opened Broadview-2 on January 10, 1981, in the name of petitioner or Anderco. Petitioner was the only authorized signatory on Broadview-2. Anderco's employer identification number appears on the Broadview-2 signature card. Petitioner's address *32 in Independence was Broadview-2's mailing address. Broadview-2 consisted of a $ 100,000 certificate of deposit, all of which came from an official check from Broadview Savings & Loan Co. to petitioner, dated October 17, 1980. On December 12, 1981, some funds from Broadview-2 and another Broadview Savings & Loan Co. account were used to buy an official check in the amount of $ 390,000, payable to Union Standard Title Co. This $ 390,000 check was to be used in connection with Anderco's purchase of real property in Richfield, Ohio. The record does not indicate what happened to the remaining funds, if any, in Broadview-2. The amount of the Broadview-2 deposit was recorded in Anderco's 1981 gross receipts and reported as 1981 Anderco income. Broadview-3
Petitioner opened Broadview-3 on January 15, 1981, in the name of petitioner or Anderco. Petitioner was the only authorized signatory on Broadview-3. Petitioner's address in Independence was Broadview-3's mailing address. Broadview-3 consisted of a $ 323,053.54 certificate of deposit, which came from five checks, listed in table 7, plus an official check from Orleans Federal Savings & Loan Association of Parma, dated June *33 4, 1979, in the amount of $ 7,189.28. See supra text after table 1. All six of these checks were made payable to petitioner's order. Table 7
Account Drawn On
Date Withdrawn
Amount
Union-1
6/13/79
$  60,000.00
Union-2
6/30/79
98,489.05
Orleans-1
6/30/79
29,019.74
Orleans-1
6/30/79
80,000.00
Orleans-2
6/30/79
48,355.47
$ 315,864.26
The record does not indicate what happened to Broadview-3, except that it was still in existence on June 30, 1981, but it had been closed by December 31, 1981. The amount of the Broadview-3 deposit was recorded in Anderco's 1981 gross receipts and reported as 1981 Anderco income. Broadview-3 was petitioner's certificate of deposit. Broadview-4
Petitioner opened Broadview-4 on January 15, 1981, in his name. Broadview-4 consisted of a $ 46,377.49 certificate of deposit, which ultimately was derived from the proceeds of United-1. The record does not indicate what happened to Broadview-4, except that it was still in existence on June 30, 1981, but it had been closed by December 31, 1981. The amount of the Broadview-4 deposit was recorded in Anderco's 1981 gross receipts and reported as 1981 Anderco income. Broadview-4 *34 was petitioner's certificate of deposit. "Loan" Repayment in 1978
On August 7, 1978, petitioner withdrew $ 50,000 from Orleans-2 (petitioner's savings account), in the form of an official check payable to Euclid National Bank, which he deposited into Euclid-1 (Anderco's business checking account). On August 21, 1978, petitioner withdrew an additional $ 30,000 from Orleans-2, in the form of an official check payable to Euclid National Bank, which he deposited into Euclid-1. See supra table 6. Petitioner told Roberto that he had borrowed $ 80,000 from Euclid National Bank and had loaned that amount to Anderco. Euclid National Bank did not lend any amount either to petitioner or Anderco in 1978. On December 29, 1978, Anderco withdrew $ 84,600 from Euclid-1 by a check payable to Euclid National Bank, which Anderco reported to Roberto as the repayment of a loan. That same day, Euclid National Bank issued an official check payable to petitioner in the amount of $ 84,600. Because petitioner told Roberto that the additional $ 4,600 was interest to Euclid National Bank, Roberto reported it as an interest expense of Anderco on Anderco's tax return; Roberto did not report the *35 $ 4,600 as income to petitioner. Petitioner held the official check until February 23, 1979, when he used $ 80,000 of it to buy a certificate of deposit in Broadview-1. The remaining $ 4,600 was deposited into petitioner's personal checking account at Cleveland Trust Co. on August 24, 1979. Anderco's $ 84,600 check to Euclid National Bank was not issued as repayment of a loan made by that bank to Anderco. Anderco did not borrow $ 80,000, or $ 84,600, or any amount in connection with the foregoing transaction. Diverted Funds Repayment in 1979
On May 17, 1979, petitioner withdrew $ 50,482.69 from Orleans-2 (petitioner's savings account) and deposited it into Euclid-1A (Anderco's business checking account). See supra table 6. On June 4, 1979, petitioner withdrew $ 57,460.63 from Orleans-1 (petitioner's savings account) and deposited it into Euclid-1A. See supra table 5 note 2. Petitioner told Roberto that these two transfers, totaling $ 107,943.32, constituted a repayment of receipts he had diverted from Anderco in 1978. Roberto was satisfied that petitioner had complied with Roberto's insistence that petitioner put the diverted receipts into Anderco's account. *36 Roberto also was satisfied that the only tax impropriety was that this $ 107,943.32 was reported as Anderco's 1979 income even though it should have been reported as Anderco's 1978 income. On three occasions, Roberto cited the repayments to Internal Revenue Service investigators as proof that, although petitioner had diverted Anderco receipts, this diversion was the result of petitioner's confusion, and was straightened out promptly once Roberto became aware of it and told petitioner to put the diverted receipts into Anderco's bank account. In fact, the transfers were merely repayments of amounts that petitioner had just recently deposited into Orleans-1 (March 9, 1979) and Orleans-2 (April 14, 1979). See supra tables 5 and 6. Petitioner did not repay to Anderco the money that had produced the increased interest that had brought the problem to Roberto's attention in the first place. Roberto was satisfied that petitioner had complied with Roberto's insistence. Roberto did not investigate further, because he did not view himself as an auditor. Additional Income in 1980-1981
Petitioner received income from Anderco in the amounts of $ 9,249.80 in 1980 and $ 5,464.66 in *37 1981 which was not reported on his 1980 or 1981 tax returns. Tax Returns
Roberto did not mail his clients' tax returns to the Internal Revenue Service; that was the clients' responsibility. Each of petitioner's tax returns for the years in issue was filed after the respective April 15 due date for each of these years. For each of these years, petitioner filed a request for an automatic 2-month extension of time to file his tax return. (Nowadays the automatic extensions are for 4 months. See infra note 20, last paragraph.) The request for 1976 was filed on June 17, 1977. The requests for the other years were timely, and the tax return for each of those other years was filed within the respective extension period. Table 8 shows the amounts of the estimated tax liabilities set forth on the requests for extension of time to file, the tax liabilities set forth on the tax returns, and the tax liabilities determined in the notice of deficiency. Table 8 Request for
Notice of
Year
Extension
Tax Return
Deficiency
1976
$ 8,000
$ 10,552.31
$ 49,147.74
1977
10,500
11,854.00
172,076.19
1978
18,300
21,500.00
64,490.65
1979
30,000
35,250.00
88,048.17
1980
51,206
47,016.00
54,189.63
1981
22,700
16,747.00
19,415.81
*38 Respondent issued the notice of deficiency on November 22, 1989, more than 3 years after each of the tax returns had been filed. The statute of limitations for 1977, 1980, and 1981 was extended under agreements executed by the parties; the notice of deficiency for 1977, 1980, and 1981 was sent before the expiration of the time for assessment for each of those years. On their joint tax returns for the years in issue, petitioner and Ella reported income from Anderco as shown in table 9. Table 9 Salary
Commission
Year
Petitioner
Ella
Petitioner
Ella
1976
-- $  4,200
$ 20,100
$  1,800
1977
-- --  16,800
6,000
1978
-- --  16,800
9,000
1979
-- --  30,000
12,000
1980
$  6,400
4,712
53,600
8,100
1981
19,200
14,136
5,141
19,200
Table 9 Dividends Sched.C -- Petitioner
Year
Petitioner
Ella
Gross
Net
1976
$ 937.50
$ 62.50
$ 20,000
$  8,493.44
1977
94.00
6.00
20,000
9,456.00
1978
94.00
6.00
20,723
10,991.00
1979
94.00
6.00
24,757
12,117.00
1980
94.00
6.00
34,160
19,329.00
1981
94.00
6.00
--  --  Petitioner and Ella also reported income from other sources as shown in table 10. The *39 numbers of payors (or sales, as the case may be) are shown in parentheses. The dividends from Anderco shown supra table 9 are not included in the amounts shown in table 10. In addition, table 10 shows the amount of the adjusted gross income that petitioner and Ella reported. Table 10
Dividends
Year
Petitioner
Ella
Joint 1976
$   445.20(3) $   307.20(1) $ 2,807.28(15)
1977
2,789.00(21)
1,767.00(18)
--
1978
4,426.00(23)
2,405.00(20)
--
1979
5,157.00(22)
2,711.00(19)
--
1980
4,275.00(23)
1,206.00(12)
--
1981
3,994.00(16)
2,054.00(10)
--
Interest
Year
Petitioner
Ella
Joint
1976
[1] $  1,188.01(5)
--  --  1977
5,232.00(6)
$   805(3)
[1] $ 171(1)
1978
13,335.00(7)
2,023(4)
[1] 210(1)
1979
17,487.00(8)
3,632(4)
--  1980
1,187.00(7)
2,380(4)
124(1)
1981
7,919.00(6)
2,378(5)
323(1)
Capital Gains & (Losses)
Adjusted
Year
Petitioner
Ella Joint Gross Income
1976
--  --  --  $  40,141.13
1977
[1] $  (54)(8) --  --  40,500.00
1978
(372)(3) $ 3,941(16)
--  59,809.00
1979
4,556(5) 4,235(29)
--  88,870.00
1980
9,459(18)
8,958(24)
--  116,101.00
1981
3,736(7) 690(9) [1] 620(3)
58,173.00
*40 Table 11 shows the gross receipts, taxable income, and tax liability reported by Anderco for the indicated years. Table 11 also shows the taxable income determined in the notice of deficiency to Anderco, and the tax liability determined in that notice of deficiency and agreed to by Anderco in the settlement in Anderco's docket. Table 11 Anderco's Tax Returns
Year
Gross Receipts
Taxable Income
Tax Liability
1975
$   162,821.30
$ (100,262.33)
-0-  1976
942,933.95
47,540.84
$   9,958.98
1977
1,051,534.00
39,148.00
-0-  1978
1,564,165.00
62,883.00
-0-  1979
2,341,447.00
125,190.00
3,834.00
1980
1,956,836.00
77,720.00
1,784.00
1981
2,556,277.00
693,142.00
292,004.00
1982
2,891,005.00
94,193.00
21,629.00
1983
2,480,065.00
89,472.00
17,702.00
Anderco Notice
of Deficiency
Anderco Notice
and Stipulated
of Deficiency Decision
Year
Taxable Income
Tax Liability
1975
$  29,311.55
$   7,569.54
1976
116,746.34
42,358.24
1977
254,086.57
72,759.55
1978
200,775.44
23,264.21
1979
551,322.76
233,329.47
1980
299,034.76
118,305.99
1981
111,075.69
27,709.82
1982
105,755.73
26,599.64
1983
99,107.61
21,556.04
*41 Later Matters
On June 3, 1983, petitioner was indicted by a Federal grand jury on (1) four counts of willfully attempting to evade his individual income tax for 1976 through 1979, in violation of section 7201; (2) four counts of willfully making and subscribing materially false corporate income tax returns for Anderco for 1977 through 1980, in violation of section 7206(1); and (3) one count of willfully aiding and assisting in the preparation of a false corporate income tax return for Anderco for 1976, in violation of section 7206(2). On October 3, 1983, petitioner pleaded guilty to the one count of willfully aiding and assisting in the preparation of a false corporate income tax return for Anderco for 1976 and to the three counts of willfully making and subscribing materially false corporate income tax returns for Anderco for 1977 through 1979. The remaining counts were dismissed on motion by the Government pursuant to a plea agreement. Petitioner was convicted and sentenced to be imprisoned for 30 days, to be placed on probation for 3 years, and to pay a fine of $ 4,000. The only tax return falseness alleged in those indictment counts to which petitioner pleaded guilty *42 was that each year Anderco omitted to report certain amounts of gross receipts and that petitioner "well knew" of these omissions. Petitioner was not acting as the agent of Anderco when he deposited corporate receipts into Euclid-2, Euclid-3, United-1, Union-1, Union-2, Orleans-1, Orleans-2, or Firestone-1. Petitioner had dominion and control, as an individual, over each of these savings accounts. The deposits of corporate gross receipts into the above accounts were gross income to petitioner in 1976, 1977, 1978, and 1979. For each of the years 1976 through 1979, petitioner had an underpayment of income tax required to be shown on his tax return; some part of the underpayment for each year was due to petitioner's fraud. Petitioner's transfers of money in 1981 did not result in a repayment of the diverted Anderco receipts to Anderco. OPINION I. Statute of Limitations
Petitioner has properly raised in his petition the affirmative defense of the statute of limitations under section 6501 (a). Rule 39. In general, section 6501[8] bars assessment of an income tax deficiency more than 3 years after the later of (1) the date the tax return was filed or (2) the due date of the *43 tax return. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069, 1075-1076 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987). *44 In the instant case, the parties stipulated that the notice of deficiency was timely for 1977, 1980, and 1981, because the statute of limitations had been extended under agreements executed pursuant to section 6501(c)(4). We have found that the tax returns for 1976, 1978, and 1979 were filed more than 3 years before the notice of deficiency was issued. Respondent contends that the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(1), [9] which provides that if a false or fraudulent return is filed with the intent to evade tax, then the tax may be assessed at any time. Petitioner maintains that respondent failed to carry the burden of proof by (1) failing to prove any underpayments of tax and (2) failing to prove that petitioner intended to evade any tax liabilities. *45 We agree with respondent. Respondent has the burden of proving the applicability of the fraud exception to the general period of limitations. Farmers Feed Co. v. Commissioner, 10 B.T.A. at 1075-1076. This burden is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). To carry this burden for a year, respondent must prove two elements: (1) That petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud. Sec. 7454(a); [10] Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 114 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), *46 affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud, but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), *47 affg. T.C. Memo. 1970-274. In carrying this burden, respondent may not rely on petitioner's failure to meet his burden of proving error in respondent's determinations as to the deficiencies. E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases there cited. Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent under reporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memos. *48 1970-144 and 1970-37; Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100; Otsuki v. Commissioner, 53 T.C. at 108. The issue of fraud poses a factual question that is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224. In order to establish fraud, respondent must show that petitioner intended to evade taxes, which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), *49 affd. 519 F.2d 1121 (5th Cir. 1975). This intent may be inferred from circumstantial evidence, Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978), including the implausibility of petitioner's explanations. Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated Mar. 14, 1951. A. Underpayments of Tax
Respondent determined that various checks that petitioner received were income taxable to petitioner for 1976 through 1979. [11] All the adjustments in the instant case for these years result from (1) amounts determined to be Anderco's gross receipts that were deposited into petitioner's savings accounts, see supra table 1, (2) two additional checks (also Anderco gross receipts) endorsed by petitioner or by Ella, and (3) the repayment of an alleged loan in 1978. *50 The parties agree that the deposits listed in table 1, supra, and the two checks endorsed by petitioner or by Ella represent gross income to Anderco. The parties also agree that petitioner received $ 4,600 of income subject to tax because of the alleged loan repayment in 1978. Petitioner contends that there is not an underpayment of tax because each of the savings accounts into which he deposited the unreported checks was held by him as a fiduciary for Anderco, and that he never intended to control them as an individual. Therefore, he contends, the income is not attributable to him. Respondent contends that because petitioner deposited the receipts into accounts over which he exercised complete dominion and control, the income is attributable to petitioner, and thus there is an underpayment of tax for each of the years 1976 through 1979. [12]
*51 We agree with respondent. In order to determine whether there were underpayments of tax, we first determine whether the amounts of the unreported checks were income to petitioner. Gross income is defined broadly to include "all income from whatever source derived." Sec. 61(a). As the Supreme Court has stated, this language was used by Congress to exert in this field "the full measure of its taxing power." Helvering v. Clifford, 309 U.S. 331, 334 [(1940)]; Helvering v. Midland Mutual Life Ins. Co., 300 U.S. 216, 233 [(1937)]; Douglas v. Willcuts, 296 U.S. 1, 9 [(1935)]; Irwin v. Gavit, 268 U.S. 161, 166 [(1925)].
Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 429 (1955). Specifically, the courts have found income present where there are "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Id. at 431. On the other hand, if petitioner was acting as an agent for Anderco, then the amounts he received would not be taxable to him. For discussions *52 of conduit and related theories, see Page v. Commissioner, 823 F.2d 1263, 1270-1271 (8th Cir. 1987), affg. T.C. Memo. 1986-275; Liddy v. Commissioner, 808 F.2d 312 (4th Cir. 1986), affg. T.C. Memo. 1985-107; Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974). The parties have stipulated that each of the items listed in table 1, supra, was gross income to Anderco and was constructively received by Anderco in the year indicated in table 1. Yet, each of those items was deposited by petitioner, albeit often only after lying fallow for several months, into a savings account that was in petitioner's name only. Each of these savings account signature cards showed petitioner's Social Security number and not Anderco's employer identification number. The interest income from these bank accounts was reported on petitioner's tax returns. There is no evidence that the bank accounts were shown as Anderco's assets anywhere on Anderco's books and records. There is no evidence that Anderco *53 had any records of receiving the items. For all the world, these items were accessions to petitioner's wealth, that petitioner clearly realized, and over which petitioner had complete dominion and control. 1976
Enclid-2, Euclid-3, and Union-1 were petitioner's savings accounts. The $ 40,000 and $ 4,887.50 items from table 1, supra, were deposited into Euclid-2 in mid-1976, together with petitioner's personal receipt -- a New York State income tax refund check. On August 3, 1976, petitioner withdrew the balance of the account. There is no suggestion that this balance was paid to Anderco or used for Anderco's purposes. The $ 6,000 and $ 10,000 items were deposited into Euclid-3 in late 1976. On August 31, 1977, petitioner withdrew the balance of Euclid-3 and, the next day, transferred it to Union-1. On June 13, 1979, petitioner withdrew substantially all the balance of Union-1, and held the withdrawal check fallow until January 15, 1981, when he used it to buy a certificate of deposit in Broadview-3. See supra table 7. Broadview-3 was in the name of petitioner orAnderco. Broadview-3 was closed some time in the latter half of 1981. Thus, not until 1981 *54 did Anderco get even an apparent interest in these two items, and even then petitioner did not relinquish his ownership of these items. Respondent has clearly and convincingly established that Black, Inc., issued an $ 8,318 check to the Company that was a corporate gross receipt of Anderco. See supra table 1 note 1, and text following table 1. This check was endorsed "for deposit only the Anderson Co." by Ella in February 1976. However, the record does not indicate what happened to the check or the proceeds. The record in the instant case does not provide enough information to justify a finding that the $ 8,318 was an accretion to petitioner's wealth. On brief, respondent suggests that the check was deposited "to Joint Account with spouse at National City bank", and proposes a finding of fact that "During the taxable year 1976, the petitioner diverted from Anderco and reduced to his personal dominion and control" the $ 8,318 check as well as the other items listed in table 1, supra. However, none of the record references listed by respondent in connection with this proposed finding deals with the $ 8,318 check directly or indirectly, and we have no evidence suggesting *55 that the check was deposited into the asserted joint account. We conclude that respondent has shown by clear and convincing evidence that petitioner had unreported income of $ 60,887.50 for 1976 (the table 1 amount), but that respondent has failed to carry the burden of proof as to the remaining $ 8,318. [13]
Petitioner contends that (1) "respondent is unable to show that even one cent of the alleged diverted funds was applied toward any personal, *56 household, consumer, or other personal expenditures", (2) the checks "were not even commingled with Mr. Anderson's personal funds", (3) every withdrawal from the savings accounts went directly or indirectly back to Anderco, and (4) petitioner "dealt with the checks at issue solely in his agency capacity as President and Treasurer of Anderco". Firstly, the absence of evidence that the diverted funds were a source of personal expenditures is a point in petitioner's favor, but does not diminish the clarity or convincing nature of the evidence that petitioner diverted $ 60,887.50 of the disputed 1976 amounts. Secondly, petitioner appears to have commingled funds at least in Euclid-2, where petitioner's and Ella's New York State income tax refund check was commingled with diverted Anderco receipts. Thirdly, the 1976 amounts remained in accounts or checks solely in petitioner's name at least until 1981 and, for all we can tell on this record, indefinitely thereafter. Fourthly, petitioner's actions with regard to the 1976 diverted amounts seem clearly to be in derogation of petitioner's claimed "agency capacity as President and Treasurer of Anderco". Petitioner claims that an agency *57 relationship was necessary because he wanted to earn interest on corporate receipts and he believed Anderco could not open corporate savings accounts. However, after Roberto discovered the diversions in 1979, petitioner withdrew $ 362,241.75 (most of Union-1 and the balances of Union-2, United-1, Orleans-1, and Orleans-2) in the form of official checks. The checks were kept by petitioner for about 18 months, without earning interest, before the checks were used to buy various certificates of deposit. Also, on many occasions, petitioner held checks for months before depositing them into his savings accounts. The foregoing persuades us that, even if petitioner believed that Anderco could not open corporate savings accounts, maximizing interest income for Anderco was not a priority for petitioner and thus could not have been a significant reason for petitioner's depositing some of Anderco's gross receipts into savings accounts opened in petitioner's name. Petitioner claims that the deposit of the $ 5,305.55 New York State income tax refund check into Euclid-2 is not an instance of commingling, but rather evidence that Euclid-2 was really Anderco's account. Petitioner argues that *58 the check "represents a receivable of The Anderson Company which was transferred to Anderco, Inc., upon its incorporation." Firstly, petitioner has not shown how the original tax payment (which was refunded by New York State) could have been a tax imposed on or paid by the Company (as distinguished from petitioner). Secondly, petitioner has not explained why any income tax paid as the Company's income tax would be repaid by way of a check to petitioner and Ella. Thirdly, petitioner has not suggested any substantial theory on the basis of which the check would properly be "a receivable of The Anderson Company". We believe the proper interpretation is the straightforward one, that the check represents a refund of an overpayment of petitioner's and Ella's individual State income tax, and was petitioner's and Ella's property. We conclude that petitioner's deposit of this check into Euclid-2 constitutes the sort of commingling that is additional evidence that Euclid-2 was petitioner's individual account and not an Anderco account. Petitioner does not suggest that he is entitled to offsetting deductions or credits for 1976. We conclude that respondent has shown by clear and convincing *59 evidence that petitioner has an underpayment for 1976. 1977
United-1, Union-2, Orleans-1, and Orleans-2 were petitioner's savings accounts. The $ 44,000 item from table 1, supra, was deposited into Euclid-3 on April 9, 1977. On April 27, 1977, petitioner withdrew $ 4,554.71 from Euclid-3 to pay a legal fee incurred in securing the $ 44,000. See supra table 2 note 1. This $ 4,554.71 reduced the accession to petitioner's wealth on account of the $ 44,000 item. The rest of the history of this item follows that of the $ 6,000 and $ 10,000 items for 1976. The $ 24,268, $ 9,853, and $ 7,130 items were deposited into United-1 in the latter half of 1977. On June 30, 1979, petitioner withdrew the balance of United-1. He held the withdrawal check fallow until mid-January 1981, when he deposited it in National City Bank, and withdrew the funds 2 days later, and used the funds to buy a certificate of deposit in Broadview-4. Broadview-4 was in petitioner's name only. Broadview-4 was closed some time in the latter half of 1981. Thus, it does not appear that Anderco ever got even an apparent interest in these items, and at least into 1981 petitioner did not relinquish *60 his ownership of these items. The $ 51,897, $ 57,374.80, $ 1,140, $ 15,018.26, and $ 13,678.26 items were deposited into Union-2 between September 2, 1977, and November 1, 1977. These amounts, plus the interest thereon, were withdrawn in two parts -- $ 50,000 on December 31, 1977, and $ 98,489.05 on June 30, 1979. Of the $ 50,000 withdrawal, $ 40,000 was transferred to Orleans-1 and $ 10,000 to Orleans-2. As table 5, supra, indicates, the $ 40,000 in Orleans-1 became part of the June 30, 1979, $ 109,019.74 withdrawal from Orleans-1, which became part of the Broadview-3 certificate of deposit. As table 6, supra, indicates, the $ 10,000 in Orleans-2 became part of the June 30, 1979, $ 48,355.47 withdrawal from Orleans-2, which also became part of the Broadview-3 certificate of deposit. [14] As table 4, supra, indicates, the $ 98,489.05 withdrawal from Union-2 also became part of the Broadview-3 certificate of deposit. See supra table 7. Thus, not until 1981 did Anderco get even an apparent interest in these five items, and even then petitioner did not relinquish his ownership of these items. *61 The $ 24,838.09 item was received in 1977 and was deposited into Orleans-2 on February 9, 1978. See supra note 5 for significance of year of receipt versus year of deposit. As can be seen from table 6, supra, most if not all of this item was included in the aggregate $ 80,000 August 1978 transfers from Orleans-2 to Euclid-1. Euclid-1 was Anderco's business checking account. If that were all the evidence regarding the $ 24,838.09 item, then the question before us might have been whether the 6-month sojourn in petitioner's Orleans-2 would be enough to cause petitioner to have to take the disputed item into income, with a possible deduction or section 1341 credit for 1978. However, in the instant case there is more. Instead of telling Roberto that there had been some delay in putting the $ 24,838.09 item into Anderco's Euclid-1 account, petitioner told Roberto that Anderco had borrowed the $ 80,000 (which included the $ 24,838.09 item). Then, on December 29, 1978, petitioner withdrew $ 84,600 from Euclid-1. Roberto was told that this was $ 80,000 to repay the loan, plus $ 4,600 to pay interest. Petitioner then used the $ 80,000 as part of the payment for a certificate *62 of deposit in his name in Broadview-1 and put the remaining $ 4,600 into his personal checking account. Thus, although this $ 24,838.09 item found its way into Anderco's possession for about 4 months, it was treated by Anderco as borrowed money. Both before and after the Euclid-1, 4-month interlude, it was in accounts owned by petitioner. We conclude that respondent has shown by clear and convincing evidence that petitioner had unreported income of $ 249,197.41 (the table 1 amount) for 1977. However, petitioner is entitled to offset this by the $ 4,554.70 in attorney fees that he paid in connection with the $ 44,000 income item. As a result, the net unreported income is $ 244,642.70. Petitioner does not suggest that he is entitled to offsetting deductions (other than the $ 4,554.71) or credits for 1977. We conclude that respondent has shown by clear and convincing evidence that petitioner has an underpayment for 1977. 1978
The $ 800 item from table 1, supra, is the net of a $ 1,800 deposit into United-1 and a $ 1,000 transfer from United-1 to Euclid-1, Anderco's business checking account. See supra table 3. Both the deposit and the transfer were made on March *63 25, 1978. The $ 800 net remained in United-1 until June 30, 1979. The rest of the history of this item follows that of the $ 24,268, $ 9,853, and $ 7,130 items for 1977. Thus, it does not appear that Anderco ever got even an apparent interest in this item, and at least into 1981 petitioner did not relinquish his ownership of this item. The $ 26,733.46 item was deposited into Orleans-2 on August 7, 1978. The rest of the history of this item follows that of the $ 24,838.09 item for 1977. After the Euclid-1 4-month "loan" interlude, it was held in accounts owned by petitioner. The $ 33,482.90, $ 400, and $ 510 items (less $ 392.90, discussed supra table 6 note 4) were deposited into Orleans-2 on October 7, 1978. As table 6, supra, indicates, they became part of the June 30, 1979, $ 48,355.47 withdrawal from Orleans-2, which then became part of the Broadview-3 certificate of deposit. See supra table 7. Thus, not until 1981 did Anderco get even an apparent interest in these three items, and even then petitioner did not relinquish his ownership of these items. However, $ 392.90 of the total of these three items was not deposited into Orleans-2, and the record does *64 not indicate what happened to the $ 392.90. On brief, respondent contends that $ 392.92 (presumably, $ 392.90 was intended) "was kept as cash by the petitioner". However, the stipulation and exhibit that respondent cites as authority merely leave the matter uncertain. Respondent has clearly and convincingly established that Dayton Power issued a $ 6,362.53 check to Anderco which was a corporate gross receipt of Anderco. See supra table 1 note 2, and text following table 1. This check was endorsed "Anderco, Inc." by petitioner, and stamped "FOR DEPOSIT ONLY" on June 4, 1979. However, the record does not indicate what happened to the check or the proceeds. Respondent suggests on brief that the check was cashed, but this conflicts with the "for deposit only" stamp, and respondent's suggestion does not direct us to any supporting evidence in the record. Similarly, respondent proposes a finding of fact that "During the taxable year 1978, the petitioner diverted from Anderco and/or reduced to his personal dominion and control" the $ 6,362.53 check as well as the other 1978 items listed in table 1, supra. However, none of the record references listed by respondent in connection *65 with this proposed finding deals with the $ 6,362.53 check, directly or indirectly. In addition to the checks diverted from Anderco, petitioner received and failed to report the $ 4,600 that was a by-product of the $ 80,000 "loan" incident. Petitioner concedes that this is income to him, and that he failed to report it. Petitioner contends that the $ 4,600 is dividend income, while respondent contends it is interest income. Apparently, the parties believe that this dispute may have a bearing on the question of fraud. In either event, it is clearly established that the $ 4,600 was unreported 1978 income to petitioner. We conclude that respondent has shown by clear and convincing evidence that petitioner had unreported income of $ 66,133.46 ( $ 61,926.36 in diverted Anderco checks (the table 1 amount), minus the undeposited $ 392.90, plus the $ 4,600 interest or dividend) for 1978, but that respondent has failed to carry this heavy burden of proof as to the remaining $ 6,755.43 ( $ 6,362.53 Dayton Power check, plus the undeposited $ 392.90). Petitioner does not suggest that he is entitled to offsetting deductions or credits for 1978. We conclude that respondent has shown by *66 clear and convincing evidence that petitioner has an underpayment for 1978. 1979
Orleans-1 and Firestone-1 were petitioner's savings accounts. The $ 6,196.40, $ 30,080, and $ 28,000 [15] items were deposited into Orleans-1 on March 9, 1979. As table 5, supra, indicates, they became part of the June 30, 1979, $ 109,019.74 withdrawal from Orleans-1 (broken into two checks $ 29,019.74 and $ 80,000), which became part of the Broadview-3 certificate of deposit. See supra table 7. Thus, not until 1981 did Anderco get even an apparent interest in these three items, and even then petitioner did not relinquish his ownership of these items. The $ 19,754.38 item was received in 1979 and was deposited into Firestone-1 on May 10, 1980. See supra note *67 5 for significance of year of receipt versus year of deposit. Petitioner withdrew almost all of this amount 6 or 7 months later. The record does not indicate what happened to the withdrawn amount or to any remaining balance. Thus, it is clear that the item was petitioner's income, and there is no credible evidence that Anderco ever had an interest in it, or that petitioner ever relinquished his interest in it. On brief, respondent contends that "On April 14, 1979, the petitioner diverted from Anderco a $ 50,482.69 check dated March 21, 1979, issued by Wisconsin Electric * * * when he * * * deposited it into his personal savings account", Orleans-2. See supra table 6. However, the parties have stipulated that, about 1 month later, the full amount of "funds derived from the Wisconsin Electric check * * * was withdrawn from [Orleans-2] * * * and deposited in [Euclid-1A] * * *." Also, the parties have stipulated that "this check is not included in the checks labeled [sic] 'diverted income' in the notice of deficiency." We conclude that this $ 50,482.69 check is not additional income to petitioner. We conclude that respondent has shown by clear and convincing evidence that petitioner *68 had unreported income of $ 84,030.78 (the table 1 amount) for 1979. Petitioner does not suggest that he is entitled to offsetting deductions or credits for 1979. We conclude that respondent has shown by clear and convincing evidence that petitioner has an underpayment for 1979. Summary and Conclusions
To summarize, we conclude that respondent has shown by clear and convincing evidence that petitioner had unreported income for the years and in the amounts shown in table 12. Table 12
Year
Amount
1976
$  60,887.50
1977
244,642.70 [1]
1978
66,133.46
1979
84,030.78
We conclude that respondent has shown by clear and convincing evidence that petitioner had an underpayment for each of the years 1976 through 1979. We hold for respondent on this issue. B. Fraudulent Intent
The factors discussed infra lead us to conclude that some part of the underpayment for each of the years 1976 through 1979 was due to petitioner's fraud. Our conclusion is based on the cumulative effect of these factors, no one of which might have been determinative by itself. For 4 consecutive years, petitioner omitted to report substantial *69 amounts of income. See supra table 12. As can be seen by comparing table 12 with the right-most column of table 10, the omitted income substantially exceeded the reported adjusted gross income for 1976, 1977, and 1978. Petitioner apparently stopped diverting new checks around mid-1979, after Roberto questioned him about the sources of his increased interest income. However, even the sharply curtailed 1979 omissions amounted to almost 95 percent of the reported adjusted gross income for that year. This pattern of substantial omissions from income for several consecutive years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d at 202; Adler v. Commissioner, 422 F.2d at 66; Otsuki v. Commissioner, 53 T.C. at 108. Petitioner's misleading of Roberto is further evidence of fraud. Farber v. Commissioner, 43 T.C. 407, 420 (1965). Petitioner misled Roberto by withholding information and by giving Roberto false information. Roberto prepared Anderco's tax returns on the basis of deposits to its corporate bank accounts and other records *70 provided by Anderco. Roberto explained this system to petitioner. Roberto prepared petitioner's tax returns on the basis of Anderco's records and Forms 1099 from other sources that were submitted to Roberto by petitioner and Ella. By depositing the diverted Anderco receipts into his personal accounts, petitioner short-circuited the record-keeping system that Roberto had established. Thus, petitioner was able to divert a substantial amount of Anderco receipts, which Roberto could not detect through Anderco's records; the diversions were accomplished in a way that did not generate Forms 1099 from other sources. As a result, petitioner succeeded for several years in concealing from Roberto a substantial amount of taxable income. Petitioner's failure to report this income to the accountant who prepared his tax returns is evidence of his intent to file false and fraudulent tax returns. We note that over the 4-year period 1976 through 1979, some $ 450,000 was concealed in this manner. It strains our credulity that petitioner, who signed both Anderco's tax returns and his own, would not have noticed that such large amounts were escaping taxation. The $ 80,000 "loan" incident is *71 further evidence of fraud. In August 1978, petitioner transferred $ 80,000 from Orleans-2 (petitioner's savings account) to Euclid-1 (Anderco's business checking account). See supra table 6. Instead of telling Roberto the truth about the transfer, petitioner concocted the following story: Petitioner told Roberto that petitioner borrowed the $ 80,000 from Euclid National Bank and lent it to Anderco. Then, petitioner told Roberto, on December 29, 1978, Anderco repaid the "loan" to petitioner with $ 4,600 interest, which petitioner then passed on to Euclid National Bank. Thus, Roberto was given to understand that petitioner was merely a conduit, for Anderco's benefit, and so Roberto did not cause Anderco to issue a Form 1099 to petitioner for the $ 4,600. In fact, as we have found (and petitioner concedes), petitioner did not return any of the $ 84,600 to Euclid National Bank. He used $ 80,000 to buy a certificate of deposit in his name in Broadview-1, and he deposited the remaining $ 4,600 into his personal checking account at Cleveland Trust Co.
At the time petitioner withdrew the $ 80,000 from Orleans-2, that account included at least $ 51,571.55 that petitioner had diverted *72 from Anderco (the Zimmer and General Motors checks, see supra table 6). Thus, petitioner in effect "laundered" more than $ 50,000 by (1) running it through Anderco's records in a way that would avoid taxability to Anderco, and (2) returning the money to petitioner in a way that would avoid an Anderco Form 1099 to petitioner, and thus apparently taxability to petitioner. Petitioner lied to Roberto in order to conceal from Roberto the fact that this $ 50,000 plus was escaping two levels of taxation. The 1979 repayment incident is further evidence of fraud. Within 2 months of Roberto's insistence that petitioner repay the diverted funds to Anderco, petitioner did indeed repay $ 107,943.32 to Anderco. He told Roberto that this was the money petitioner had diverted in 1978. Roberto, who was not an auditor, was satisfied that the problem he had discovered (the otherwise unexplained increase in petitioner's and Ella's interest income) was now resolved. In fact, petitioner had not returned any of the diverted Anderco receipts that had generated the suspicious interest. As table 12, supra, indicates, in 1979 petitioner diverted about $ 84,000 in addition to the about $ 108,000 *73 of diversions that he ostentatiously returned to Anderco. Thus, by misleading Roberto, petitioner allayed Roberto's concerns even as petitioner kept all the previously diverted money that had given rise to Roberto's concerns in the first place. These elaborate schemes to mislead Roberto (the 1978 loan incident and the 1979 repayment incident) are strong evidence that petitioner understood what he was doing and that his purpose was to take and keep income without paying income taxes thereon. Petitioner has depicted himself as a successful businessman ignorant of the consequences of incorporation. When a claim of ignorance or honest mistake is made, this Court must consider the taxpayer's intelligence, education, and tax expertise. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986); Iley v. Commissioner, 19 T.C. 631, 635 (1952). Petitioner is a college graduate who had been working in the construction industry for many years. By 1976, the first of the years in issue, petitioner had worked for Turzillo for 16 years, had operated the Company for 3 years, and had operated Anderco for 1 year. When he left Turzillo, petitioner *74 had been the executive vice-president for several years, had routinely received financial statements and summaries, and had been a stockholder. Petitioner's and Ella's 1976 tax return also shows dividend income from 18 different payors, in addition to Anderco. We are satisfied that petitioner's intelligence, education, and business understanding were such that he knew what he was doing with regard to the omitted income in the instant case. In addition, petitioner has already pleaded guilty to willfully falsifying Anderco's tax returns for all of the same years involved in the fraud issue in the instant case, by knowingly failing to report substantial amounts of Anderco's gross receipts. Thus, petitioner has, in effect, admitted to an understanding of how gross receipts can be omitted [16] and the unlawfulness of doing so. See McLaughlin v. Commissioner, 29 B.T.A. 247, 249 (1933); see also Mobley v. Commissioner, 33 F.3d 1382 (11th Cir. 1994), affg. T.C. Memo. 1993-60. The parties have stipulated that all the amounts that petitioner was charged with omitting from his tax returns for 1976 through *75 1979 (except for the 1978 $ 4,600 item) also had been omitted from Anderco's tax returns for the same years. This leads us to conclude that petitioner had the understanding and the inclination necessary such that some part of his omissions from income for each of the years 1976 through 1979 was fraudulent. Those omissions led directly to the underpayments of tax in the instant case. The implausibility of petitioner's explanation also may be persuasive evidence of fraud. Boyett v. Commissioner, 204 F.2d at 208. We consider petitioner's explanations as to (1) earning interest for Anderco, *76 (2) removing Ella from control over Anderco's cash, and (3) why he let substantial amounts of money lie fallow for 1-1/2 years. At trial, petitioner testified that his putting Anderco's money into interest-bearing accounts in his own name was an effort to benefit Anderco by helping Anderco earn interest that it could not earn directly. However, petitioner's testimony as to his motives is belied by (1) the failure to report on Anderco's tax return the interest so earned, supposedly for Anderco, (2) petitioner's holding of many of the diverted checks for months before depositing them, thus foregoing opportunities to earn interest, and (3) petitioner's June 1979 withdrawals of substantial amounts which were then allowed to lie fallow for more than 1-1/2 years, at a time of extraordinarily high interest rates. See Bureau of Census, U.S. Dept. of Commerce, Statistical Abstract of the United States 1993, at 520, table 826 (113th ed.). Also, we note that petitioner chose to exercise his alleged stewardship of Anderco's assets by intercepting checks from outsiders, rather than having Anderco write checks to him for the purpose of investing in savings accounts. Petitioner's choice resulted *77 in his being able to act without explaining anything to anyone (until Roberto asked about the interest), and with neither he nor Anderco having to pay income taxes on the diverted checks. The alternative, depositing Anderco's receipts into Anderco's accounts and then withdrawing from those accounts amounts to be deposited into savings accounts to produce interest, would have meant that (1) Anderco would have had to record the receipts and thus pay taxes on the diverted Anderco receipts and on the interest earned on those receipts, (2) petitioner would have had to explain to Roberto why the amounts were withdrawn from Anderco's accounts, and (3) steps would have had to be taken to make clear that the savings accounts really belonged to Anderco, and not to petitioner. We believe that petitioner's actions were motivated by a desire to evade taxes, rather than a desire to earn interest for Anderco. We do not believe that the choice petitioner made was an accident. We do not believe that petitioner diverted the checks to earn interest for Anderco. Putting it bluntly, we do not believe petitioner's testimony. The fact that petitioner so testified under oath is to us further evidence *78 of his fraudulent intent. Petitioner's testimony and position on brief are that he opened Euclid-2 in his own name because of a violent dispute with Ella and his desire "to remove Mrs. Anderson from control over company cash and the company checkbook." Presumably, his 3-year string of diversions of some $ 450,000 is to be explained by this desire, and by implication this desire is to negate any fraudulent intent. Petitioner devotes about 30 proposed findings of fact to this chapter of his and Ella's life. Firstly, the simple way of removing Ella's control was to remove her as a signatory on Euclid-1, Anderco's business checking account. Petitioner did that on September 16, 1976, but not until about 4 months after the mid-May violence that he, Ella, and Sledz described in their testimony. This suggests that (1) keeping Ella from writing Anderco checks or withdrawing Anderco funds was not that high a priority for petitioner, and (2) the complexity of establishing new accounts and shifting funds from one account to another, which we have detailed supra, was not needed in order for petitioner to accomplish his professed goal of removing Ella from control over Anderco's funds. *79 Also, by September 1976 (if not sooner), petitioner had realized that he could accomplish his professed goal simply by removing Ella as a signatory. Thus, petitioner's professed goal of removing Ella's control could not be a major reason for the many new accounts, deposits, and fund-shifting activities that petitioner dealt with after September 1976. Secondly, the use of petitioner's home address on almost all of the other accounts into which petitioner deposited the diverted Anderco receipts, together with the joint tax return reporting of the interest on those accounts, meant that Ella would have access to the information (1) that the accounts existed and had substantial balances, and (2) that funds were frequently shifted from one account to another. See supra note 3; sec. 6013(e)(1)(C). We conclude that the fight-with-Ella story is little more than a red herring dragged across the trail; it provides a human-interest distraction but not a believable nonfraud explanation of petitioner's failure to report substantial amounts of income for each of 4 consecutive years. When petitioner was asked about the over-$ 9,000 increase in interest income from 1977 to 1978, see supra *80 table 10, he told Roberto for the first time that he was depositing corporate receipts into his personal accounts. Roberto told him that the income had not been picked up previously. Petitioner responded that the income obviously was being picked up at that point and indicated that he did not understand the problem. Although his accountant had felt the matter important enough to call petitioner on a Sunday morning and advise him to transfer the money to an Anderco corporate account at once so it could be picked up as income, petitioner merely withdrew funds from his savings accounts (United-1, Union-1, Union-2, Orleans-1, and Orleans-2), and held them without taking further action. Petitioner testified that Roberto told him to withdraw the amounts, but that petitioner either did not hear, or did not understand, that he should redeposit the funds. Even if Roberto neglected to explain what petitioner should do with the funds, we believe it improbable, at best, that petitioner would neglect to find out what to do with such a large sum of money for 1-1/2 years. The story of the approximately $ 108,000 repaid in 1979, shortly after Roberto's alarmed telephone call to petitioner, *81 is consistent with Roberto's testimony that he told petitioner to deposit the diverted Anderco receipts into Anderco's bank account, and gives the lie to petitioner's contention. Petitioner's bizarre explanation for his bizarre activity strengthens, rather than weakens, respondent's case. In attempting to show that petitioner "did not intend to exert dominion and control over these funds" (the diverted Anderco receipts), petitioner contends that -- Every withdrawal from the accounts was ultimately deposited in either an operating account of Anderco * * *, in the Broadview * * * [-3] account, or, in the case of the United [-1] account, in the Broadview * * * [-4] account, or it was disposed of for some other corporate purpose.
Firstly, these transactions, even if interpreted as showing Anderco's possession, dominion, or use, occurred in 1981 and do not materially detract from the force of the considerations that have led us to conclude that petitioner had dominion and control over the diverted Anderco receipts in 1976, 1977, 1978, and 1979, and fraudulently omitted to report the income on his tax returns for these years. The "cat had been let out of the bag" by September *82 10, 1979; the most charitable view of petitioner's 1981 actions would be to describe them as damage control. Secondly, we cannot agree that the record shows that the diverted amounts indeed made their way into Anderco's assets or were used for Anderco's benefit. To some extent, the funds in Broadview-2 were used for Anderco's benefit, but we cannot trace any of the diverted Anderco receipts into Broadview-2. Petitioner's theory, that the funds deposited into Broadview-2 were derived from Broadview-1, requires a "leap of faith" that we see no reason to take. Petitioner also asks us to find that on December 31, 1981, he withdrew $ 200,000 from Broadview-3 and deposited it into Euclid-1A, Anderco's business checking account. It appears that Broadview-3 was derived from the diverted Anderco receipts; however, we cannot find evidence that the $ 200,000 deposited into Euclid-1A came from Broadview-3. Also, as to Broadview-4, we note that (1) that account was in petitioner's name only (i.e., not petitioner or Anderco), and (2) the record does not indicate what happened to the funds in Broadview-4, except that they were withdrawn at some point in the second half of 1981. By the times *83 of the Broadview-2, Broadview-3, and Broadview-4 transactions, petitioner was well aware of respondent's investigations. We would have expected that petitioner would have laid careful paper trails to show that funds deposited into these three accounts were Anderco's and not his. Nevertheless, what we find is a continuation of his pattern of establishing numerous accounts and transferring funds between those accounts in ways designed to confuse rather than to clarify. Based on petitioner's intentional, substantial diversions of Anderco's receipts into his personal savings accounts, his concealment of these diversions from his accountant, and the incredible explanations petitioner offered to this Court in his testimony and on brief, we conclude that respondent has clearly and convincingly proven that petitioner intended to evade his income taxes for each of the years 1976 through 1979, which taxes petitioner knew or believed he owed, by conduct intended to conceal this income. Accordingly, the statute of limitations does not bar respondent's assessment of deficiencies for petitioner's 1976, 1978, and 1979 Federal income tax returns. Sec. 6501(c)(1). We hold for respondent on this *84 issue. II. Fraud Additions to Tax
A. In General
We have held that, because of petitioner's fraud, the statute of limitations does not bar assessment of any deficiency or additions to tax for 1976, 1978, or 1979. In our analysis, we concluded that petitioner also committed fraud for 1977. In order to impose the 50-percent addition to tax on petitioner for a year, respondent must prove, by clear and convincing evidence, that petitioner has an underpayment of tax for that year, and that some part of that underpayment is due to fraud. Sec. 6653(b). [17] Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried the burden of proof as to the 50-percent addition to tax for each of the years 1976 through 1979. *85 We hold for respondent on this issue. B. Underpayment Defined
Respondent asserts by amendment to answer that the additions to tax under section 6653(b) for 1976 through 1979 should be increased. Respondent contends that the notice of deficiency mistakenly determined that petitioner's tax returns for each of these years was filed on or before the last day prescribed for filing, including extensions. Respondent contends that (1) petitioner's application for an extension of time for filing the 1976 tax return was untimely, and (2) petitioner's applications for extensions of time for filing the 1977, 1978, and 1979 tax returns, although timely, did not include bona fide and reasonable estimates of the tax liability owed, and so were not valid. As a result, respondent contends, under section 6653(c)(1) the amount of the underpayment for each of the years 1976 through 1979 is petitioner's entire tax liability for that year, and not merely petitioner's deficiency for that year. Because the 50-percent fraud addition to tax is 50 percent of the "underpayment", the increase in the underpayment for each of the years would result in an increase in the amount of the 50-percent fraud *86 addition to tax for that year. In the instant case, this would increase the aggregate amount of the section 6653(b) additions to tax by almost $ 40,000. Petitioner relies on his contention that there were not any deficiencies. We agree with respondent. Section 6653(c)(1)[18] provides that in determining the amount of the base to which the 50-percent fraud addition to tax is applied, the tax shown on a tax return shall be taken into account only if the tax return was filed timely, taking into account any extension of time for filing the tax return. *87 Each of petitioner's tax returns for 1976 through 1979 was filed after the regular due date for that tax return. However, petitioner filed requests for automatic extensions of time for filing these tax returns, and filed his tax returns within the extended periods. To determine whether there were valid extensions of time for filing petitioner's tax returns, we turn to section 6081(a), [19] *88 which authorizes respondent to grant extensions of time to file tax returns. Pursuant to the authority granted in section 6081(a), the Secretary of the Treasury promulgated section 1.6081-4(a), Income Tax Regs., [20] which provides that, among other requirements, the application for automatic extension of time must (1) be filed on or before the date prescribed for the filing of the tax return, and (2) show the "full amount properly estimated as tax for such taxpayer for such taxable year". *89 Respondent has shown that the application for an extension of time for filing petitioner's 1976 tax return was filed on June 13, 1977, which was after the regular due date for his 1976 tax return. Subparagraphs (1), (3), and (5) of section 1.6081-4(a), Income Tax Regs., prohibit any extension unless the request for extension was filed by the regular due date of the tax return. The request for extension as to 1976 was not filed timely. Therefore, the regulation prohibits the claimed 1976 extension. Because petitioner's 1976 tax return was filed after the due date for that tax return, it follows that the tax liability shown on petitioner's 1976 tax return is not to be taken into account in determining the amount of petitioner's 1976 underpayment, within the meaning of section 6653(c)(1). Petitioner does not contend that there was an "undue hardship", within the meaning of section 1.6081-4(a)(5), Income Tax Regs., and so we do not consider whether respondent should have granted an extension retroactively under that provision. Also, petitioner does not contend that respondent in fact granted a retroactive extension; thus, we do not have occasion to consider the implications of *90 Eastman Mach. Co., Inc. v. United States, 841 F.2d 469, 472-473 (2d Cir. 1988). The validity of the timely filed extension requests for 1977, 1978, and 1979 depends on whether petitioner "properly estimated" his income tax liabilities on these extension requests. Pars. (1), (4), and (5) of sec. 1.6081-4(a), Income Tax Regs. This, in turn, depends on whether petitioner made "a bona fide and reasonable estimate of his tax liability [for each year] based on the information available to him at the time he makes his request for extension [for that year]." Crocker v. Commissioner, 92 T.C. 899, 908 (1989). As table 8, supra, indicates, petitioner's tax return for each of the years 1977 through 1979 shows a tax liability greater than the tax liability estimated on the request for extension for that year. As can be seen by comparing table 12, supra, with the rightmost column of table 10, supra, the omitted income for each of these years is substantial in comparison to the income shown on petitioner's tax returns for the corresponding years. Thus, petitioner's estimates of tax liabilities on his requests for extension *91 greatly understated what we conclude are his true tax liabilities. Also, we have concluded that these understatements are due to petitioner's fraud. The foregoing applies with equal force to the late-filed 1976 tax return extension request. We conclude that petitioner's applications for an extension of time for filing a tax return for each of the years 1976 through 1979 did not include bona fide and reasonable estimates of petitioner's tax liability. The applications are invalid and the automatic extensions received by petitioner are void. Because the tax return for each of these years was filed after the unextended due dates for the respective returns, the tax liability shown on each of these tax returns is not to be taken into account in determining the amount of petitioner's underpayment for each of the years 1976 through 1979, within the meaning of section 6653(c)(1). We hold for respondent on this issue. III. Amounts of Deficiencies
In part I of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there were underpayments of tax, some part of which was due to fraud; respondent carried this burden. In this part of the opinion, *92 petitioner has the burden of proving, by a preponderance of the evidence, that respondent erred in the notice of deficiency determinations as to matters of fact. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In part I of this opinion, we considered the adjustments for 1976 through 1979, and we concluded that respondent was correct as to substantially all of them. See supra table 12. This conclusion applies, a fortiori, to this part of the opinion as well. We proceed to consider the remaining adjustments for 1976 through 1979, year-by-year. See supra note 5. We then consider 1980 and 1981. 1976
The evidence shows that all the notice of deficiency adjustment items for 1976, except the Black, Inc., $ 8,318 check to the Company, are income to petitioner, and we so concluded in part I of this opinion. In part I we stated that "the record does not indicate what happened to the [Black, Inc., $ 8,318] check or the proceeds", after Ella endorsed the check. This same lack of information leads us to conclude that petitioner has failed to carry his burden of proving that the Black, Inc., $ 8,318 check was not income to him. *93 We hold for respondent as to all the 1976 adjustments. 1977
The evidence shows that all the notice of deficiency adjustment items for 1977 are income to petitioner, and we so concluded in part I of this opinion. However, in part I we also concluded that petitioner was entitled to offset the income by the $ 4,554.71 that he spent on a legal fee incurred in securing a $ 44,000 inclusion item. We come to the same conclusion in this part of the opinion. We hold for respondent as to all the 1977 adjustments; we hold for petitioner as to the $ 4,554.71 offset. 1978
The evidence shows that all the notice of deficiency adjustment items for 1978, except the Dayton Power $ 6,362.53 check to Anderco and the $ 392.90 undeposited amount, are income to petitioner, and we so concluded in part I of this opinion. In part I we stated that "the record does not indicate what happened to the [Dayton Power $ 6,362.53] check or the proceeds", after petitioner endorsed the check. The same is true as to the $ 392.90 undeposited amount. This same lack of information leads us to conclude that petitioner has failed to carry his deficiency burden of proof as to the Dayton Power $ 6,362.53 *94 check and the $ 392.90 undeposited amount. Petitioner concedes that the $ 4,600 adjustment item is income to him; his only dispute is whether this item was interest income or dividend income. The parties do not suggest that the amount of petitioner's deficiency is affected by whether the $ 4,600 is interest or a dividend, and so we do not resolve that dispute. LTV Corp. v. Commissioner, 64 T.C. 589 (1975). We hold for respondent as to all the 1978 adjustments. 1979
The evidence shows that all the notice of deficiency adjustment items for 1979 are income to petitioner, and we so concluded in part I of this opinion. We come to the same conclusion in this part of the opinion. We hold for respondent as to all the 1979 adjustments. 1980 and 1981 income -- ordinary and necessary business expenses
The parties have stipulated that petitioner received $ 9,249.80 in 1980 and $ 5,464.66 in 1981 as income from Anderco. Respondent contends that the payments represent dividend income to petitioner. Petitioner maintains that the amounts were reimbursements for expenditures made by him as an agent of Anderco, and that the underlying expenditures *95 should be allowed as ordinary and necessary business expenditures to offset this income. We agree with respondent. Petitioner has not directed our attention to, and we have not found, any evidence as to the asserted "underlying expenditures", and so we have no basis for any conclusion that respondent erred in the notice of deficiency or that petitioner is entitled to any offsetting deduction. We hold for respondent on this issue. 1981 deduction -- repayments to Anderco
In the alternative, petitioner contends that if we conclude that he is taxable on the diverted Anderco receipts for 1976 through 1979, then he is entitled to a 1981 deduction under section 165(c)(2), or a credit under section 1341, for repaying diverted gross receipts to Anderco by depositing money into Broadview-2, Broadview-3, and Broadview-4. In addition, petitioner maintains that the funds in those three accounts made their way into Anderco's checking account or were used for Anderco's purposes. Respondent contends that the establishment of a joint account does not end petitioner's dominion and control over the diverted gross receipts. In addition, respondent maintains that the diverted receipts did *96 not make their way into Anderco's business checking account and were not used for Anderco's purposes. Because there was not any repayment, respondent maintains, petitioner is not entitled to a deduction under section 165(c)(2) (losses) or a credit under section 1341 (claim of right). Respondent concedes that if we were to find that a repayment occurred, then petitioner would be entitled to a deduction under section 165(c)(2), but, respondent maintains, petitioner still would not be entitled to a section 1341 credit, nor would petitioner would be entitled to a net operating loss carryover. Sec. 172. We agree with respondent. Although the amounts of the deposits to Broadview-2, Broadview-3, and Broadview-4 were recorded as gross receipts on Anderco's books and reported as income to Anderco in the years so deposited, petitioner continued to hold at least a joint interest in the diverted Anderco receipts. Apparently, he could withdraw the entire amount at any time in his individual capacity. We conclude that petitioner's deposits into the three Broadview accounts did not cause him to lose dominion and control over the funds, and did not effect repayments to Anderco. As we have *97 stated supra, we have no information as to whether the amounts in Broadview-2 had been diverted from Anderco during 1976 through 1979, nor do we have information as to whether the amounts in Broadview-3 and Broadview-4 somehow made their way back to Anderco's assets. In the absence of a repayment, there is no deduction. In the absence of a deduction, there is no option for a credit under section 1341. We hold for respondent on this issue. To take account of the foregoing, Decision will be entered under Rule 155. Footnotes
*. Alan T. Durst was petitioner's counsel throughout the proceedings before the Court; he withdrew after the briefs were filed and other posttrial proceedings were completed.↩
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
1. Apparently, respondent already had assessed an addition to tax of $ 348.63 under sec. 6651(a)(1) for 1976. Respondent concedes that this addition to tax must be abated if the Court determines that petitioner is liable for the addition to tax under sec. 6653(b). Sec. 6653(d)↩.
2. The addition to tax is 50 percent of the interest on $ 2,868.63.↩
2. On brief, petitioner failed to argue the negligence issue; we treat this as, in effect, a concession by petitioner that he is liable for additions to tax under sec. 6653(a) for 1980, and pars. (1) and (2) of sec. 6653(a) for 1981. See subpars. (4) and (5) of Rule 151(e); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Money v. Commissioner, 89 T.C. 46, 48 (1987). Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioner filed joint tax returns with his wife, Ella S. Anderson (hereinafter sometimes referred to as Ella), for each of the years in issue. Respondent conceded that Ella qualified for innocent spouse treatment under sec. 6013(e) as to all adjustments, and so did not issue a notice of deficiency to Ella. Although Ella thus has no liability for the deficiencies, petitioner has the benefit of the deficiencies having been computed at joint tax return rates. See Bokum v. Commissioner, 94 T.C. 126, 152 n.23 (1990), affd. 992 F.2d 1132↩ (11th Cir. 1993).
4. In the interest of clarity, the following accounts (savings accounts or checking accounts, unless described as certificates of deposit) will hereinafter sometimes be referred to as follows: ↩
Account
Term
Euclid National Bank #045-2595-7
Euclid-1
Euclid National Bank #045-4236-3
Euclid-1A
Euclid National Bank #04 005184 6
Euclid-2
Euclid National Bank #322159-8-01,
formerly numbered #04 005516 7
Euclid-3
United Savings Association
United-1
#031203213 8
Union Savings #061134525 7
Union-1
Union Savings #061134533 1
Union-2
Orleans Fed. Savings & Loan
Orleans-1
of Parma #1-78-00998
Orleans Fed. Savings & Loan
Orleans-2
of Parma #1-78-00999
Firestone Bank #593-7712
Firestone-1
Broadview Savings & Loan #08-H-98489
(certificate of deposit)
Broadview-1
Broadview Savings & Loan #08-H-149790
(certificate of deposit)
Broadview-2
Broadview Savings & Loan #08-H-149793
(certificate of deposit)
Broadview-3
Broadview Savings & Loan #08-H-205843
(certificate of deposit)
Broadview-4
5. Table 1 is organized by year of receipt of the check giving rise to the deposit, not by year of deposit. The parties have stipulated that each of these items, and the two items described immediately after table 1, were gross income to Anderco for the years in which the checks were received. Respondent also appears to have treated the items as income to petitioner for the years in which the checks were received, and not when they were deposited. Compare Grant v. Commissioner, T.C. Memo. 1994-161 (respondent treated amounts as income to both an individual and his corporation when the amounts were deposited into the individual's accounts) and Kahrahb Restaurant, Inc. v. Commissioner, T.C. Memo. 1992-263 (respondent treated amounts as income to a corporation when the amounts were deposited into the corporation's accounts, and as income to individuals when the corporation paid the individuals' expenses). In the instant case, several of the items referred to in table 1 and the text immediately thereafter, were not deposited into any of petitioner's accounts until the following year. Petitioner disputes the taxability of the amounts of these items, but does not dispute the taxable year of inclusion in gross income. In the circumstances of the instant case, we will limit ourselves to what is disputed by the parties. Estate of Fusz v. Commissioner, 46 T.C. 214, 215↩ n.2 (1966).
1. The total for 1976 does not include a check from Frank L. Black, Jr., Inc. (hereinafter sometimes referred to as Black, Inc.), to the Company which was not deposited to any of the accounts listed supra note 4.↩
2. The total for 1978 does not include a check from Dayton Power & Light Co. (hereinafter sometimes referred to as Dayton Power) to Anderco which was not deposited to any of the accounts listed supra note 4.↩
6. The New York State income tax refund check states on its face that it represents refunds for 1973 and 1974, and that it includes interest. On their 1976 tax return, petitioner and Ella do not report any income from State income tax refunds, nor do they report any interest income from New York State. See American Viscose Corp. v. Commissioner, 19 B.T.A. 937 (1930), affd. 56 F.2d 1033 (3d Cir. 1932); see also Stewart v. Commissioner, 714 F.2d 977, 981 (9th Cir. 1983), affg. T.C. Memo. 1982-209↩. Anderco's 1976 tax return does not show anything that indicates it is affected by this refund check. Respondent has not determined that this refund check constitutes additional income to petitioner.
7. The parties have stipulated that the amount withdrawn was "$ 56,546.00", but the withdrawal slip plainly shows the additional 72 cents.↩
1. Anderco gross receipts items, shown in table 1, supra.↩
2. On April 27, 1977, petitioner withdrew $ 4,554.71 from Euclid-3 to pay a legal fee incurred in securing the $ 44,000 from Fred Meir Construction Co.↩
1. Anderco gross receipts items, shown in table 1, supra.↩
2. The $ 800 net of these two items is treated by the parties as one Anderco gross receipts item, shown in table 1, supra.↩
1. Anderco gross receipts items, shown in table 1, supra.↩
1. Anderco gross receipts items, shown in table 1, supra.↩
2. The $ 28,000 net of these three items is treated by the parties as one Anderco gross income item, shown in table 1, supra.↩
1. Anderco gross receipts items, shown in table 1, supra.↩
2. The Zimmer USA check was dated Dec. 16, 1977, and was constructively received by Anderco in 1977.↩
3. "Loan" repayment items, discussed infra.↩
4. All three of these checks were endorsed "For Deposit Only". The sum of these three checks is $ 34,392.90. Yet, both the deposit slip and the account ledger show that only $ 34,000 was deposited into Orleans-2.↩
1. Tax return does not show whether the income was petitioner's, Ella's, or joint. ↩
8. Sec. 6501 provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title [title 26, the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early return. -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩
9. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
10. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.↩
The foregoing text reflects an amendment by sec. 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1834, which took effect Jan. 1, 1977.
11. We recognize that the parties have stipulated that the statute of limitations is not in issue for 1977. Nevertheless, we consider petitioner's 1977 actions at this point because any patterns established may have a bearing on our analysis of other years. E.g., Adler v. Commissioner, 422 F.2d 63, 66 (6th Cir. 1970), affg. T.C. Memo. 1968-100↩.
12. Because the parties stipulated that Anderco's "earnings and profits * * * were sufficient to permit the full amount of the funds alleged to have been diverted by the petitioner to be taxed as ordinary income under a constructive dividend theory", we need not consider, in the instant case, the "wrongful diversion" and sec. 312 issues dealt with in Hagaman v. Commissioner, 958 F.2d 684, 692 (wrongful diversion), 695 (sec. 312) (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-549↩.
13. On opening brief, respondent requested findings of fact to the effect that, for each of the years 1976 through 1979, petitioner "reduced to his personal dominion and control" all of the claimed diversions from Anderco. See supra↩ table 1 and text following table 1. Petitioner did not object to this requested finding as to 1976. In view of petitioner's objections to the corresponding proposed findings as to 1977 through 1979, we treat this failure to object to the proposed finding as to 1976 as merely a typographical error and not as a concession by petitioner.
14. With regard to table 6, supra, as explained infra↩, we associate the other February 9, 1978, deposit ( $ 24,838.09) and the three August 7, 1978, deposits with the August 1978 withdrawals transferred to Euclid-1. We associate the $ 10,000 deposit, and the October 7, 1978, deposits, with the June 30, 1979, withdrawal that closed Orleans-2.
15. The $ 28,000 item from table 1, supra, is the net of the $ 28,505.12 and $ 56,955.51 deposits to Orleans-1 on Mar. 9, 1979, and the $ 57,460.63 transfer from Orleans-1 to Euclid-1A, Anderco's business account, on June 4, 1979. See supra↩ table 5.
1. $ 249,197.41 income, less $ 4,554.71 offset.↩
16. At trial, petitioner testified as follows: Q [Ms. Decker] Did you know that if income checks were deposited to corporate checking accounts that they were then picked up as income on the corporate tax returns? A [Petitioner] Yes. Q And did you know that the only income that was picked up on the corporate income tax return were the deposits to corporate checking accounts? A Yes, um-hum.↩
17. Sec. 6653(b) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (b) Fraud. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *
The later amendments of this provision by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 616), sec. 1503 of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742), sec. 1015(b)(2)(B) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), and subsecs. (a) and (c)(1) of sec. 7721 of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89 -- Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case. As a result of OBRA 89, the revised fraud addition to tax now appears in secs. 6663 and 6651(f).↩
18. Sec. 6653(c)(1) provides, in pertinent part, as follows: SEC. 6653. FAILURE TO PAY TAX. * * * (c) Definition of Underpayment. -- For purposes of this section, the term "underpayment" means -- (1) Income, estate, gift, and certain excise taxes. -- In the case of a tax to which section 6211 (relating to income, estate, gift, and certain excise taxes) is applicable, a deficiency as defined in that section (except that, for this purpose, the tax shown on a return referred to in section 6211(a)(1)(A) shall be taken into account only if such return was filed on or before the last day prescribed for the filing of such return, determined with regard to any extension of time for such filing) * * *↩
The later revision of this provision by subsecs. (a) and (c)(1) of sec. 7721 of OBRA 89 does not affect the instant case. As a result of OBRA 89, the revised definition of "underpayment" appears in sec. 6664(a).
19. SEC. 6081. EXTENSION OF TIME FOR FILING RETURNS. (a) General Rule. -- The Secretary may grant a reasonable extension of time for filing any return, declaration, statement, or other document required by this title [title 26, the Internal Revenue Code] or by regulations. Except in the case of taxpayers who are abroad, no such extension shall be for more than 6 months.↩
The foregoing text includes a 1976 amendment which does not affect the instant case.
20. Sec. 1.6081-4(a), Income Tax Regs., provides, in pertinent part, as follows: Sec. 1.6081-4. Automatic extension of time for filing individual income tax return. (a) In general. (1) An individual who is required to file an income tax return on Form 1040 for any taxable year ending on or after December 31, 1971, shall be allowed an automatic 2-month extension of time to file such return after the date prescribed for filing of the return only if the requirements contained in subparagraphs (2), (3), and (4) of this paragraph are met. * * * (3) The application must be filed on or before the date prescribed for the filing of the return of the individual with the internal revenue officer with whom the individual is required to file his income tax return. (4) Such application for extension must show the full amount properly estimated as tax for such taxpayer for such taxable year, and such application must be accompanied by the full remittance of the amount properly estimated as tax which is unpaid as of the date prescribed for the filing of the return. (5) Upon the timely filing of Form 4868, properly prepared, and accompanied by remittance of the full amount of the estimated unpaid tax liability, the 2-month extension shall be considered as allowed. Except in undue hardship cases, no extension of time for filing an individual income tax return shall be granted under sec. 1.6081-1 until an individual has properly availed himself of the provisions of this paragraph.
This text takes into account an amendment made by T.D. 7567, 1978-2 C.B. 320, 321. The later amendment of this provision by T.D. 7885, 1983-1 C.B. 338↩, 339, changing the automatic extension period from 2 months to 4 months for tax returns for years ending on or after Dec. 31, 1982, does not affect the instant case.